IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DWIGHT WILLIAMS, ET AL. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-1979 |
| CITY OF PHILADELPHIA, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                     **JUNE 13, 2016**

Presently before the Court is the parties' joint request for approval of their Settlement Agreement. For the following reasons, the Settlement Agreement will be approved.

**I.     BACKGROUND**

On April 28, 2008, Plaintiffs filed the instant class action against the City of Philadelphia and others (collectively, the "City Defendants") seeking injunctive and declaratory relief under Fed. R. Civ. P. 23(b)(2). The Complaint alleges that the Philadelphia Prison System ("PPS") is subjecting inmates to "dangerous, unsanitary, severely overcrowded, degrading, and cruel conditions of confinement." (Compl. ¶ 1, ECF No. 1.) Specifically, it alleges that the PPS's practice of housing three inmates in cells designed to hold only two—referred to as "triple-celling"—violates the Eighth and Fourteenth Amendments of the United States Constitution. (*Id.* ¶ 3.) On October 8, 2010, the Court certified the case as a class action, defining the relevant class as:

> All persons who are or will in the future be confined in the Philadelphia Prison System, and who are or will in the future be subjected to the conditions of confinement, including triple celling, or placement in dormitories, without minimally adequate security, services or programs as set forth in plaintiffs' Complaint.

(Oct. 8, 2010 Order, ECF No. 80.)

When the Complaint was filed, the inmate population in the PPS was at a historic high of over 9,300 inmates. (Compl. ¶ 1.) Over 2,500 inmates were housed in triple cells. (Settlement Agreement 1.) In 2011, the population had been reduced to approximately 7,600 with an "in-house" population of approximately 7,200. (*Id*. at 2.) Triple-celling had been reduced, and there was no additional triple-celling at one of the prisons—Riverside Correctional Facility ("RCF"). (*Id*.) On August 8, 2011, after the inmate population in the PPS significantly decreased, the Court approved a settlement agreement (the "2011 Settlement Agreement") between the parties that would preserve the status quo and provide for monitoring of the situation by Plaintiffs' counsel over the coming years. (Aug. 8, 2011 Mem. Op. 2-3, ECF No. 93.) In the fall of 2012, Plaintiffs exercised their right under the 2011 Settlement Agreement to reopen the case due to a rising inmate population in the PPS. (*See* ECF No. 99.)

Since the reinstatement of the Complaint, the parties have engaged in extensive discovery. (Settlement Agreement 2.) Over the past eight months, the prison population has again reduced significantly. (*Id*.) As of January 12, 2016, the population was reduced to 7,550, and the in-house population was reduced to 7,128. There were 1,380 inmates triple celled at the Curran-Fromhold Correctional Facility ("CFCF") and House of Corrections ("HOC"). According to the Settlement Agreement, these reductions were the result of:

> fewer admissions to PPS, expansion of the "Video Crash Court" program which accelerates the disposition of minor cases (and related probation and parole detainers), consolidation of probation and parole hearings to expedite resolution of detainers, special release hearings at which bail orders are reviewed and reduced, a number of "diversion" programs whereby persons charged or subject to charges for minor crimes are either not arrested or, if arrested, are diverted into programs without prosecution, specialized courts (including Mental Health Court, Veteran's Court, Dawn's Court (prostitution cases), and Drug Court); video extradition hearings, and increased use of house arrest and GPS Monitoring.

(Settlement Agreement 2.)  As of the time of the fairness hearing, the population of inmates in the PPS had been in the 7,400 to 7,500 range, and remained fairly constant (i.e., there were no spikes) over the prior six weeks.  (May 5, 2016 Hr'g Tr. 6 (on file with Court).)

The parties anticipate further decrease in PPS population in the next couple of years as a result of the City of Philadelphia's receipt of the MacArthur Foundation funding grant.  The MacArthur grant, which was awarded in April of 2016, will fund a project aimed at reducing jail population by approximately 30% over a two-to-three year period.  (Settlement Agreement 3.)  This initiative marks the first time that the City's criminal justice system partners—the Defender Association of Philadelphia, the Philadelphia District Attorney's Office, the First Judicial District of Pennsylvania, the Managing Director's Office, the Philadelphia Police Department, and the Philadelphia Prison System—have engaged in sustained cooperation around the common goal of reducing the PPS population.  (Phila.'s Appl. for Implementation Funding 14 (on file with Court).)  Moreover, measures identified in the MacArthur grant proposal have the support of Philadelphia's Mayor.  Some of the measures funded by the grant include developing and implementing pre-arrest diversion programs for low-risk offenders, reducing cash bail amounts and increasing utilization of community-based alternatives to cash bail, providing continuity of services coordination for individuals with mental illness, and implementing administrative programs to help expedite plea offers and parole petition review.  (*Id.* at 4-7.)  The parties believe that the MacArthur grant initiatives, together with the City Administration's backing of these initiatives, will result in significant population reductions at PPS facilities, and potentially a de-commissioning of one facility.  (May 5, 2016 Hr'g Tr. 6.)  A reduction of the prison population by 30% could bring an end to the practice of triple-celling.

In early 2016, the parties entered into settlement negotiations. On March 16, 2016, we granted preliminary approval of the proposed Settlement Agreement and scheduled a fairness hearing for May 5, 2016. (Mar. 16, 2016 Order, ECF No. 141.) Our Order also directed that the City Defendants post the Notice of Class Action Settlement in every housing unit and in every law library in the PPS. (*Id*.) The Notice of Settlement was forwarded to all PPS Wardens, and was posted in all PPS housing units and law libraries. (Vrato Decl.; ECF No. 142.) Approximately 18 inmates housed in the PPS filed objections to the proposed settlement.

The fairness hearing was held on May 5, 2016. (May 5, 2016 Hr'g Tr.) At the hearing, the parties agreed that the Settlement Agreement was fair and reasonable. The Court raised a concern with one aspect of the Agreement, namely that it provided a one-year period during which Plaintiffs may reinstate the Complaint. (*Id*. at 7.) The Court suggested that a two-year period would be more appropriate, particularly in light of the fact that it will take many months to see any results from implementation of the MacArthur grant initiatives. (*Id*.) Counsel for the City of Philadelphia responded that the additional time for monitoring proposed by the Court is not necessary, but ultimately agreed to extend the time period to two years. (*Id*. at 16.) The parties submitted a revised Settlement Agreement to the Court reflecting this change.

Taking into consideration the reduction in the inmate population at the PPS, this Settlement Agreement essentially preserves the status quo and provides for monitoring of the situation by Plaintiffs' counsel for the next two years. (Settlement Agreement 4-6.) The City Defendants agree to continue making reasonable efforts to implement and operate programs, policies, and procedures designed to reduce the population at the PPS. These initiatives include expansion of the Video Crash Court program, consolidation of probation and parole hearings, implementing special release hearings, specialized courts, video extradition hearings, and

increasing the use of house arrest and GPS monitoring. (Settlement Agreement 1, 4.) In addition, the City Defendants agree to continue making reasonable efforts (1) to minimize the use of lockdowns and restricted movements and provide inmates with medical, legal, and social services during any lockdown or restrictive movement periods; (2) to ensure that any inmates in triple cells are provided clean cells, adequate bedding, and access to adequate showers and toilets; and (3) to identify inmates who are Seriously Mentally Ill ("SMI") and limit the use of triple-celling for SMI inmates. (*Id*. at 4-5.) Finally, the City Defendants agree to provide Plaintiffs' counsel with information regarding the prison population, triple-celling, and other relevant matters on a monthly basis for a 24-month period beginning on the date that the Settlement Agreement is approved. (*Id*. at 5.) Plaintiffs' counsel will also have the right to inspect any of the PPS facilities if the population is "significantly higher" than the population at the time the Court approves the Settlement Agreement. (*Id.*)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(e), the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Final approval of a class-action settlement requires a finding by the Court that the settlement is fair, reasonable, and adequate. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592 (3d Cir. 2010).

In *Girsh v. Jepson*, the Third Circuit articulated nine factors for district courts to consider in deciding whether a class-action settlement is fair, reasonable, and adequate:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible

recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (alterations omitted)).[1] We must make findings regarding the *Girsh* factors where appropriate. *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). However, we cannot "substitute the parties' assurances or conclusory statements for [our own] independent analysis of the settlement terms." *Id.* at 350-51.

## II. ANALYSIS[2]

### A. The Complexity, Expense and Likely Duration of the Litigation

This litigation has been ongoing for over eight years. In fact, litigation against the City of Philadelphia concerning unconstitutional conditions present at the PPS has an even longer

---

[1] Subsequently, the Third Circuit advised that in light of the "sea-change in the nature of class actions," it may be useful for courts to consider the following factors in addition to the *Girsh* factors:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). However, because this is a Rule 23(b)(2) class action seeking injunctive relief only, the *Prudential* factors do not apply. We will limit our discussion to the *Girsh* factors.

[2] Since this is a Rule 23(b)(2) class action for injunctive relief, not all the *Girsh* factors apply. We need not consider the ability of Defendants to withstand a greater judgment, the range of reasonableness of the settlement fund in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Serventi v. Bucks Technical High Sch.*, 225 F.R.D. 159, 167 (E.D. Pa. 2004) (noting that certain factors do not apply where class does not seek monetary damages).

history.  From as early as 1971, state and federal courts in Pennsylvania have been grappling with constitutional claims by PPS prisoners related to their conditions of confinement.  *See, e.g.*, *Jackson v. Hendrick*, 764 A.2d 1139, 1141 (Pa. Commw. Ct. 2000) (describing the "tangled [30-year] history" of a state class action suit filed by prisoners in PPS regarding conditions of confinement); *Harris v. City of Philadelphia*, No. 82-1847, 2000 U.S. Dist. LEXIS 12579 (E.D. Pa. Aug. 30, 2000) (approving settlement agreement in 18-year federal class action by PPS inmates concerning overcrowding conditions at PPS); *Bowers v. City of Philadelphia*, No. 06-3229, 2007 U.S. Dist. LEXIS 5804 (E.D. Pa. Jan. 25, 2007) (granting plaintiffs' request for declaratory and injunctive relief in suit against City of Philadelphia regarding conditions of confinement, including triple-celling).  We believe that settlement of the case before us will for the first time put an end to this protracted history of litigation involving the conditions at PPS.

The parties have already engaged in significant discovery, and would require additional discovery in the event the case went to trial.  The trial itself would be costly and complex as much of the evidence will be expert testimony.  The first factor weighs in favor of the proposed Settlement Agreement.

      **B.**      **The Reaction of the Class to the Settlement**

As we noted above, the Notice of Class Action Settlement was forwarded to all PPS Wardens, and was posted in all PPS housing units and law libraries.  Of the nearly 7,400 to 7,500 inmates at PPS, only 18 submitted objections to the proposed settlement.  The objections, for the most part, relate to the prison's use of triple-celling, and the conditions associated with overpopulation.  None of the objections relate specifically to the terms set forth in the Settlement Agreement.  At the fairness hearing, Plaintiffs' counsel indicated that he reviewed the objections carefully, and that he was still convinced, given the fairly small number of objections as

compared to the population at PPS, that the Settlement Agreement is appropriate. We agree that the relative number of objections compared to the population of inmates at PPS militates in favor of approving the Settlement Agreement. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement."). We also believe that the objections—which relate predominantly to the conditions associated with triple-celling—will largely be resolved by the measures and initiatives outlined in the Settlement Agreement and the MacArthur grant. This factor also weighs in favor of approving the Settlement Agreement.

### C.   The Stage of the Proceedings and the Amount of Discovery Completed

"This factor captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had adequate appreciation of the merits of the case before negotiating." *In re Cendant*, 264 F.3d at 235 (citation and internal quotation marks omitted).

At the time the 2011 Settlement Agreement was approved, the Court noted that the parties had already completed a significant amount of discovery. *See Williams v. City of Philadelphia*, No. 08-1979, 2011 U.S. Dist. LEXIS 87467, at *10 (E.D. Pa. Aug. 5, 2011). After Plaintiffs exercised their right under the 2011 Settlement Agreement to reopen the case, the parties entered into additional extensive discovery. *See Williams v. City of Philadelphia*, No. 08-1979, 2014 U.S. Dist. LEXIS 150474, at *3-4 (E.D. Pa. Oct. 22, 2014) (discussing discovery efforts by the parties after the case reopened). Discovery measures taken by the parties included coordinating tours of the PPS facilities for Plaintiffs' expert witnesses, and supplemental document requests related to medical and mental health care at PPS. *See id*. at *4-5. On October

22, 2014, and November 4, 2014, we entered Orders, together with supporting Memoranda, directing that additional discovery be provided by Corizon Health, Inc., the contracted provider of medical services in the PPS. (ECF Nos. 125, 126, 128, 129.) Based on the considerable amount of discovery already completed in this case, we are satisfied that Plaintiffs' counsel adequately evaluated the merits of the constitutional claims before engaging in settlement negotiations. This factor also weighs in favor of approving the proposed settlement.

### D.     The Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors assess the "possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319. In our Memorandum approving the 2011 Settlement Agreement, we observed that:

> If one were to look at the 40-year history of prison litigation involving conditions in the PPS, one could conclude that Plaintiffs face no risk in establishing liability. Consistently over the years, both state and federal courts have taken the City Defendants to task for conditions in the PPS that were caused by overcrowding and that failed to pass constitutional muster.

*Williams*, 2011 U.S. Dist. LEXIS 87467, at *10-11. Consistent with this observation, we concluded in a separate 2007 case involving PPS, that the conditions at PPS related to overcrowding were unconstitutional. *See Bowers v. City of Philadelphia*, No. 06-3229, 2007 U.S. Dist. LEXIS 5804 (E.D. Pa. Jan. 25, 2007). However, as noted above, since the case was reopened in 2012, the City has implemented measures that have proved successful in reducing the prison population at PPS and addressing issues associated with overcrowding.

In addition, the law surrounding the constitutionality of triple-celling is unclear. In 2008, the Third Circuit concluded that triple-celling alone is not, by itself, unconstitutional. *See Hubbard v. Taylor*, 538 F.3d 229, 235 (3d Cir. 2008). The court considered the plaintiffs'

9

specific grievances as part of the "totality of the circumstances within the institution." *Id*. In our 2011 Memorandum approving the 2011 Settlement Agreement, we observed that although federal courts are "split on the issue of whether requiring an inmate to sleep on a mattress on the floor violates the Constitution . . . [t]he majority has concluded that it does not." *Williams*, 2011 U.S. Dist. LEXIS 87467, at *12 n.2 (citing cases). Based on this precedent—which we note has not changed significantly since our 2011 Memorandum—we recognized that "[a]ttempting to establish that triple-celling at the PPS is unconstitutional under the present circumstances and under *Hubbard* is not without risk." *Id*. at 12. The same conclusion holds true today. We must reiterate, however, that "we do not endorse triple-celling as a long-term solution to the prison overcrowding problem." *Id*. (confirming our observation in *Bowers* that "even if triple-celling is permissible as a short-term emergency solution, it is not tenable as a permanent cure").) This factor weighs in favor of approving the proposed settlement.

Moreover, the risks associated with establishing damages also weigh in favor of approving the Settlement Agreement. Although this action seeks injunctive relief only, and not damages, "the risks inherent in seeking injunctive relief are always significant." *Id*. at *14 (citing *Inmates of Northumberland Cnty. Prison v. Reish*, No. 08-0345, 2011 U.S. Dist. LEXIS 46600, at *9 (M.D. Pa. Apr. 29, 2011)).

      **E.**      **The risks of Maintaining the Class through the Trial**

We see no particular risk of modification or decertification of the class during or prior to trial. This factor weighs against approving the settlement.

**IV.**    **CONCLUSION**

After consideration of the *Girsh* factors, in light of the progress made to date in addressing the overcrowding at the PPS, and considering the changes that have been made and

will in the future be made as a result of the MacArthur Foundation grant, we are satisfied that the proposed settlement is fair, reasonable, and adequate. Accordingly, the joint request for approval of the Settlement Agreement will be granted.

An appropriate Order follows.

                                            **BY THE COURT:**

_____

                                        **R. BARCLAY SURRICK,   J.**